**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

GISSELLE VASQUEZ,                                                      21-cv-4620

                              Plaintiff,

                                                                 **OPINION & ORDER**

                   -against-

YONKERS PUBLIC SCHOOL DISTRICT,
DR. EDWIN M. QUEZADA.

                              Defendants.

----------------------------------------------------------------X

VICTORIA REZNIK, United States Magistrate Judge:[1]

        Pending before the Court is a joint summary judgment motion filed by Defendants

Yonkers Public School District (YPS) and Dr. Edwin M. Quezada.  (ECF No. 81).  For the

reasons below, Defendants' motion for summary judgment is **GRANTED**.[2]

## I.        FACTUAL BACKGROUND[3]

        On September 27, 2013, Plaintiff began her employment with YPS as a School Aide

---

[1] On May 24, 2022, the parties consented to proceed before a Magistrate Judge (ECF No. 60) and this case was assigned to Magistrate Judge Paul Davison.  On May 24, 2023, this case was reassigned to the undersigned.

[2] On March 14, 2024, Plaintiff filed a proposed order dismissing with prejudice the case against Defendant Evelina Medina under Rule 41(a)(2) of the Federal Rules of Civil Procedure.  (ECF No. 94).  The following day, this Court so-ordered Plaintiff's proposed order and dismissed the case against Medina.  (ECF No. 95).  As a result, this Opinion & Order does not address the summary judgment motion previously filed by Medina on July 21, 2023. (ECF No. 77).

[3] Unless otherwise stated, the following facts are undisputed and are derived from YPS's and Quezada's Rule 56.1 Statement of Facts, Plaintiff's Responses and Statement of Additional Material Facts to YPS's and Quezada's Rule 56.1 Statement, and YPS's and Quezada's Responses to Plaintiff's Statement of Additional Material Facts.  (ECF No. 92). When citing these facts, all internal citations, quotation marks, footnotes, and alterations are omitted, unless otherwise noted.

assigned to Saunders Trade and Technical High School.  (ECF No. 92 at 3).[4]  Plaintiff was

promoted to the position of Clerk I-Spanish Speaking in April 2016 and assigned to work at

Dodson Public School.  (*Id.* at 3).  Evelina Medina was the Principal of Dodson during Plaintiff's

employment there and Christopher Cassano was an Assistant Principal.  (*Id.* at 3 – 4).[5]

Plaintiff's complaint adds that Sandra Guzman was an Assistant Principal at Dodson as well.[6]

(ECF No. 1 at 3).

Plaintiff alleges that Medina sexually harassed her in various ways during her

employment at Dodson.  (ECF No. 92 at 11 – 13).[7]  Plaintiff alleges that Medina asked Plaintiff

to photograph Medina with her "pants down" and then requested that Plaintiff "edit the photos to

remove cellulite."  (*Id.*)  Plaintiff also alleges that Medina "demanded that Plaintiff store photos

of her boyfriend's penis and a photo of him in his underwear on Plaintiff's phone," and that

Medina "grabbed Plaintiff by the neck to simulate sex with her boyfriend."  (*Id.*)  In addition,

Plaintiff alleges that Medina "asked Plaintiff to buy her romantic lingerie from Romantic Depot,"

and "encouraged Plaintiff to have a sexual relationship with Mr. Cassano."  (*Id.*)  Plaintiff also

alleges that she was sexually harassed by Guzman, including an allegation contained in

Plaintiff's complaint that Guzman asked her "[h]ow many times a week do you have sex?"  (ECF

No. 1 at 6; ECF No. 92 at 7, 10, 14).

---

[4] ECF No. 92 restarts labeling its numbered paragraphs on page 11, which means that there are duplicated paragraph numbers.  As a result, this opinion cites to the applicable page number, instead of the paragraph number.  All cited page numbers in this order refer to the number printed at the bottom of the filed page, unless otherwise stated.
[5] On January 19, 2022, Judge Vincent Briccetti granted Cassano's motion to dismiss.  (ECF No. 46).
[6] On January 19, 2022, Judge Briccetti granted Guzman's motion to dismiss.  (ECF No. 46).
[7] Plaintiff included these allegations in the Statement of Additional Material Facts that she filed in response to YPS's and Quezada's Rule 56.1 Statement.  (ECF No. 92).  Medina did not file a response to Plaintiff's Statement of Additional Material Facts, but Defendants YPS and Quezada did file a response and deny knowledge or information sufficient to admit or deny the allegations about what occurred between Plaintiff and Medina.  (ECF No. 92 at 11 – 13).  In any event, even accepting these allegations as true, Plaintiff's remaining Section 1983 Retaliation and *Monell* claims fail for the reasons outlined in Section IV.

On March 29, 2019, Cassano attempted to kiss Plaintiff while in the back of Dodson's main office. (ECF No. 92 at 4, 13 – 14). On or about April 10, 2019, Plaintiff complained to Medina about Cassano's conduct. (*Id.* at 5). On April 11, 2019, Plaintiff filed a written Title IX Complaint about Cassano's conduct with the City of Yonkers Human Resources Department. (*Id.*) The Title IX Complaint did not mention any inappropriate conduct by Medina. (*Id.*) On April 12, 2019, Dr. Quezada (the Superintendent) transferred Cassano out of Dodson and Plaintiff spoke with EEO Coordinator Robert Voorheis and another unidentified female from HR about her Title IX complaint. (*Id.* at 5, 6). Voorheis is designated under the YPS Title IX policy to handle Title IX claims. (*Id.* at 6). The Plaintiff did not make any complaints to Voorheis about Medina during the April 12 discussion. (*Id.* at 6).

In April 2019, Plaintiff sought the help of Lionel Turner, President of the CSEA Union, to obtain a transfer out of Dodson. (*Id.* at 7).[8] Turner spoke to Quezada and Quezada asked Turner to have Plaintiff email him a transfer request. (*Id.* at 7, 16).[9] On April 17, 2019, Plaintiff emailed Dr. Quezada and requested that she be transferred out of Dodson. (*Id.* at 7 – 8). That same day, Quezada emailed Deputy Commissioner of Human Resources, Theresa Forget, asking her to effectuate the transfer on April 23, 2019 (after the Easter Break). (*Id.* at 8).

On April 23, 2019, Plaintiff was "voluntarily" transferred "at her request" from her Clerk I-Spanish Speaking position at Dodson to a Clerk I-Spanish Speaking position at Cesar Chavez

---

[8] Plaintiff alleges that she relayed to Turner allegations of sexual harassment against Medina, Cassano, and Guzman. (ECF No. 92 at 7). Plaintiff also claims that she reported to Turner that her Title IX Complaint against Cassano was "being spread around Dodson." (*Id.*)

[9] The parties dispute what Turner conveyed to Quezada, and both Turner and Quezada gave conflicting deposition testimony regarding which of Plaintiff's allegations Turner mentioned to Quezada. (ECF Nos. 82-4 at 80 – 87; 82-8 at 20 – 30; 92 at 7, 15, 16). Quezada testified that "[m]y recollection is that he [Turner] indicated that Ms. Vasquez felt uncomfortable because people in school were talking about her complaint," and Turner testified that he informed Quezada that Plaintiff was sexually harassed by Medina. (ECF Nos. 82-4 at 84; 82-8 at 20 – 30). Plaintiff endorses Turner's testimony (ECF No. 92 at 7). For the reasons explained in Section IV below, even if the Court resolves this ambiguity in Plaintiff's favor and assumes that Turner's version is correct, Plaintiff's claims still fail as a matter of law.

Public School.  (*Id.* at 1, 3, 8).[10]  Plaintiff had no further contact with Medina after this transfer.

(*Id.* at 8).  On September 1, 2020, Plaintiff began leave under the Family First Coronavirus

Response Act (FFCRA) and returned to work on November 24, 2021.  (*Id.* at 10 – 11).  The

written job descriptions of "Clerk I-Data" and "Clerk I-Spanish Speaking" are identical except

that a Clerk I-Spanish Speaking is required to speak Spanish and translate.  (*Id.* at 2 – 3).  At

Dodson, Plaintiff's work hours were from 7:30 am – 3:00 pm.  (*Id.* at 3).  When Plaintiff began

working at Cesar Chavez, her work hours were from 8:30 am – 4:30 pm.  (*Id.* at 2).  The week

she began work at Cesar Chavez, she asked to change her work hours due to childcare needs.

(*Id.*)  In response, that same week the principal changed her hours to 8:00 am – 3:30 pm.  (*Id.*)

In addition, "[P]laintiff's salary did not change when she was transferred from Dodson to Cesar

Chavez and she continued to receive all pay increases and benefits to which she is entitled under

the collective bargaining agreement ("CBA") between the Yonkers Board of Education and

CSEA."  (*Id.* at 4).

On April 25, 2019, while her Title IX complaint was being investigated, Plaintiff

emailed Theresa Forget (the Deputy Commissioner of HR) asking for a meeting on April 26 and

stating that she would like to share some information.  (*Id.* at 8).  Forget responded and said that

she was unavailable on April 26 and asked whether another HR employee could assist.  (*Id.* at 9).

---

[10] Despite acknowledging on pages 1 and 8 of the parties' Rule 56.1 submission that Plaintiff serves as a Clerk I-Spanish Speaking at Cesar Chavez, on page 11 of that same document, Plaintiff denies currently working as a Clerk I-Spanish Speaking and states that "[she] currently works in a less favorable role at Chavez as Data Clerk I." (ECF No. 92 at 1, 8, 11).  In her deposition, Plaintiff stated that at Chavez "[I am] sitting as a clerk 1 Spanish-speaking, but I'm doing the duties of a data clerk, which is a lot more work than I was doing at Dodson."  (ECF No. 82-3 at 77).  Elsewhere in her deposition, Plaintiff notes that at Dodson "80 percent of my job, [sic] there was just translation," and that at Cesar Chavez she handles other tasks such as attendance, report cards, and late passes.  (*Id.* at 7 – 8).  In her brief, Plaintiff first claims that "YPS transferred Plaintiff to Chavez school as a Data Clerk I with different less favorable hours and duties" (ECF No. 88 at 2) and later claims that her transfer "added a double role as a Data Clerk in addition to her primary and original role of Clerk Spanish Speaking I."  (*Id.* at 15).  (The parties' papers appear to interchangeably use numerous variations of the "Data Clerk" and "Clerk I-Spanish Speaking" titles – i.e. "Data Clerk I" vs. "Clerk I-Data" – so the Court does not distinguish between the variations of those terms in this order).

On April 26, 2019, Plaintiff responded to Forget stating that she managed to speak with Voorheis (the EEO Coordinator) and that if she needed to speak with Forget in the future she would contact her office for an appointment.  (*Id.*)

On April 29, 2019, the Plaintiff sent a letter to Mr. Voorheis, stating that, "as they discussed on April 26, she felt there was a breach of privacy because another employee had information about her Title IX complaint."  (*Id.*)  Voorheis did not investigate Plaintiff's concerns about her complaint being disseminated at Dodson after she was transferred out of the school.  (*Id.* at 19).

On May 21, 2019, Plaintiff wrote to Mr. Voorheis, without copying Quezada or any other YPS employee, asking for the status of her case and stating that there is other information that she would like to inform him about.  (*Id.*)  Plaintiff explained that "I feel safe addressing it now that I am no longer at Robert C. Dodson."  (ECF No. 82-15 at 2; *see also* ECF No. 92 at 9).

Voorheis completed investigating Plaintiff's Title IX complaint and prepared a report dated June 10, 2019.  (ECF No. 92 at 9).  Voorheis provided a copy of this report to Quezada in June 2019.  (*Id.*)  On November 19, 2019, Plaintiff wrote to Voorheis, without anyone else copied, and mentioned that she had other information to provide to him, such as a voice recording of Cassano apologizing for trying to kiss her and other information on Ms. Medina and Ms. Guzman.  (*Id.* at 10).  On November 21, 2019, Voorheis replied to this email by advising Plaintiff that her Title IX Complaint against Cassano was considered founded and is now closed.  (*Id.* at 10).  Voorheis testified that he did not advise Plaintiff of the outcome of her Title IX complaint against Cassano before November 2019 due to an oversight.[11]  (*Id.* at 10, 23; ECF No.

---

[11]  Plaintiff appears to "deny, as characterized," this fact in response to paragraph 48 of page 10 of the combined Rule 56.1 Statement.  But Plaintiff appears to acknowledge this fact in paragraph 50 of page 23 of the same document.  (ECF No. 92 at 10, 23).

82-6 at 65).[12]  By that time, Medina had resigned from her employment with YPS effective August 2019.  (ECF No. 92 at 4).

## II.     PROCEDURAL BACKGROUND

On May 24, 2021, Plaintiff filed a complaint against the City of Yonkers, YPS, Dodson, Cesar Chavez, Medina, Cassano, Guzman, and Quezada.  (ECF No. 1).  In it, she alleges that she was sexually harassed by Medina, Cassano, and Guzman and that YPS and Quezada retaliated against her when she tried to report the misconduct.  (*Id.*)  On August 18, 2021, Medina filed her answer (ECF No. 22) and Defendants City of Yonkers, YPS, Dodson, Cesar Chavez, and Quezada jointly moved to dismiss (ECF No. 23).  On August 31, 2021, Guzman and Cassano moved to dismiss.  (ECF Nos. 30, 33).[13]

On January 19, 2022, Judge Briccetti issued an order granting in part the motions to dismiss, after which the only remaining claims were those against Medina and "plaintiff's Section 1983 retaliation and *Monell* claims against the Yonkers Public School District and Quezada (First and Second Causes of Action)."  (ECF No. 46 at 1).  On February 9, 2022, Judge Briccetti held a telephonic conference where he explained the Court's order on the parties' motions to dismiss.  (ECF No. 71-1).  Judge Briccetti also so-ordered a stipulation between the parties that dismissed all claims against Medina except for the Section 1983 retaliation and *Monell* claims (First and Second Causes of Action).  (ECF No. 51).

On February 2, 2022, YPS and Dr. Quezada filed their answer.  On May 24, 2022, pursuant to 28 U.S.C. § 636(c), the parties consented to proceed before a Magistrate Judge and this case was reassigned to Magistrate Judge Paul Davison.  (ECF No. 60).  On May 24, 2023,

---

[12] ECF No. 82-6 is a deposition transcript.  All citations to deposition transcripts include a pin cite to the pdf page number and not the page number at the bottom of the filed page.
[13] Cassano re-filed on September 7, 2021, due to a filing error.  (ECF No. 36).

this case was reassigned again to the undersigned.  On July 21, 2023, Defendants YPS and

Quezada filed a joint motion for summary judgment (ECF No. 81) and Evelina Medina moved

for summary judgment as well (ECF No. 77).  On March 14, 2024, Plaintiff filed a proposed

order voluntarily dismissing her claims against Medina, and this Court so-ordered Plaintiff's

request the next day.  (ECF Nos. 94, 95).  Consequently, the only remaining claims are the

Section 1983 retaliation and *Monell* claims against YPS and Quezada.

### III.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A fact is material under Rule 56 where it "might affect the outcome of the suit under the

governing law."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *Red Tree Invs., LLC*

*v. Petróleos de Venez., S.A.*, 82 F.4th 161, 170 (2d Cir. 2023).  A dispute about a material fact is

"genuine" when "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Id*.  In determining whether the moving party has met its burden of proving

that there are no genuine disputes of material fact, the Court must resolve all ambiguities and

draw all factual inferences for the party opposing the motion.  *Union Mut. Fire Ins. Co. v. Ace*

*Caribbean Mkt*., 64 F.4th 441, 445 (2d Cir. 2023).  "Assessments of credibility and choices

between conflicting versions of the events are matters for the jury, not for the court on summary

judgment."  *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

"When the nonmoving party bears the burden of proof at trial, summary judgment is

warranted if the nonmovant fails to make a showing sufficient to establish the existence of an

element essential to its case."  *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (alteration and

internal quotation marks omitted).  Thus, "[a] defendant moving for summary judgment must

prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996). Summary judgment is also appropriate when the movant submits undisputed evidence "that negates an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017). But summary judgment must be denied if the Court finds "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## IV.   DISCUSSION

After voluntarily dismissing her claims against Defendant Medina, Plaintiff's two remaining claims are the Section 1983 retaliation claim (in Count 1) and the *Monell* claim (in Count 2) against both YPS and Quezada. For her retaliation claim, Plaintiff alleges that she suffered materially adverse employment actions because (1) she was transferred to Cesar Chavez; (2) YPS officials failed to properly investigate her various complaints; and (3) YPS officials delayed notifying her about the outcome of her Title IX complaint. (ECF No. 88 at 14 – 17). For her *Monell* claim, Plaintiff alleges that Defendants are liable because "Quezada was vested with state power to enforce all YPS policies" and failed to follow up on her complaints of Medina's sexual harassment and "exhibited a deliberate indifference when he failed to inquire with Plaintiff further about what was making her feel unsafe." (*Id.* at 21).

Defendants YPS and Quezada jointly move for summary judgment on both remaining claims, arguing that they did not engage in unlawful retaliation as a matter of law and that Plaintiff cannot establish that any alleged retaliatory conduct resulted from a municipal policy or custom. For the reasons explained below, Defendants' motion is GRANTED.

### A. **Section 1983 Retaliation Claim**

"A state employee may bring a retaliation claim under Section 1983 against a supervisor who, acting under color of law, retaliates against him for opposing discrimination in the terms of his employment." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82 (2d Cir. 2015). The elements of a Section 1983 retaliation claim based on an equal protection violation mirror those under Title VII. *Vega*, 801 F.3d at 91.  At summary judgment, Title VII retaliation claims are evaluated under the three step *McDonnell Douglas* burden-shifting analysis. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).

First, Plaintiff must establish a prima facie case of retaliation by showing: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 112 (2d Cir. 2019).  The Plaintiff's burden at this first step is "de minimis," and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Hicks*, 593 F.3d at 164.  Title VII retaliation claims must be proved according to but-for causation, which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (*quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

Second, "if the plaintiff sustains this initial burden, a presumption of retaliation arises," and the "defendant must then articulate a legitimate, non-retaliatory reason for the adverse employment action." *Hicks*, 593 F.3d at 164.  Third, the burden shifts back to Plaintiff to establish that the non-retaliatory reason offered by Defendant is a mere pretext for retaliation.

*Kirkland v. Cablevision Sy*s., 760 F.3d 223, 225 (2d Cir. 2014); *Valentine v. HNTB Corp.*, No. 21 CIV. 4616 (JPC), 2023 WL 2752121, at *6 (S.D.N.Y. Mar. 31, 2023).  To demonstrate that an employer's explanation is pretextual, the plaintiff must show that "retaliation was a 'but-for' cause of the adverse action."  *Zann Kwan*, 737 F.3d at 845; *Henderson v. Sikorsky Aircraft Corp.*, 590 F. App'x 9, 10 (2d Cir. 2014).

Here, Defendants move for summary judgment on Plaintiff's retaliation claim, arguing that she cannot establish that she suffered a materially adverse employment action or that there was any causal relationship between her protected activity and the alleged adverse employment action.  (ECF No. 83 at 10 – 18).  The Court addresses each of these arguments below.

1. Plaintiff cannot establish that she suffered a materially adverse employment action as a matter of law.

Adverse employment actions in the context of retaliation claims must be "materially adverse," meaning that they might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  *De Jesus-Hall v. New York Unified Ct. Sys.*, 856 F. App'x 328, 331 (2d Cir. 2021) (summary order); *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011).  "Trivial harms"—i.e., "those petty slights or minor annoyances that often take place at work and that all employees experience"—are not materially adverse. *Tepperwien*, 663 F.3d at 568.  Plaintiff claims that she suffered materially adverse employment actions because (1) she was transferred to Cesar Chavez where she had to perform more job duties with different hours; (2) Defendants failed to investigate her various complaints; and (3) Defendants failed to promptly inform her of the outcome of her Title IX complaint.  (ECF No. 88 at 14 – 17).  But even if the Court accepts all these allegations as true, they still do not rise to the level of a materially adverse employment action as a matter of law.

First, Plaintiff's transfer to Cesar Chavez cannot be considered a materially adverse employment action.  Plaintiff asserts that she now must perform the duties of a Data Clerk I in addition to those of a Clerk I-Spanish Speaking, and that her new hours cause her to pay for additional childcare.  (ECF No. 88 at 15).  But reassignment of job duties is not automatically considered a materially adverse employment action.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006).  Indeed, "[t]he courts in this Circuit have generally declined to find that transfers (or denials of transfers) amount to adverse employment actions, even in the context of a retaliation claim, where the action results merely in 'an inconvenience, such as an increased commute or unfavorable hours.'"  *Ray v. New York State Ins. Fund*, No. 16 CIV. 2895 (NRB), 2018 WL 3475467, at *11 (S.D.N.Y. July 18, 2018).

Here, the undisputed evidence shows that Plaintiff's official job responsibilities and work hours at her old and new job are substantially the same.  Plaintiff claims that she now must perform the role of a "Data Clerk I," on top of her old job responsibilities as a "Clerk I-Spanish speaking."  (ECF No. 88 at 15).  But the written job descriptions for these two positions are identical except that a "Clerk I-Spanish Speaking" must also translate Spanish.  (ECF No. 92 at 2 – 3).  In addition, Plaintiff's new job hours differ by only thirty minutes in the morning and afternoon, and her salary, pay increases, and benefits did not change.  (ECF No. 92 at 2 – 4).  Given these undisputed facts, it is hard to see how a reasonable worker might be dissuaded from making or supporting a charge of discrimination because they were transferred to a new position with virtually the same official responsibilities, salary, benefits, and hours as their old one.  Indeed, in this case, the undisputed evidence shows that Plaintiff herself was not so dissuaded.  For instance, after her transfer, Plaintiff admits that she emailed the Deputy Commissioner of HR, Theresa Forget, asking for a meeting; she spoke with Voorheis (the EEO coordinator)

regarding the dissemination of her Title IX Complaint; and she messaged Voorheis at least twice stating that she wanted to provide more information.  (ECF No. 92 at 8 – 10).  In fact, Plaintiff's May 21, 2019, letter to Voorheis specifically said that she now felt comfortable making such charges *because* of her transfer: "I feel safe addressing it now that I am no longer at Robert C. Dodson."  (ECF No. 82-15 at 2; *see also* ECF No. 92 at 9).  Then, on November 19, 2019, Plaintiff wrote to Voorheis, identifying Medina and Guzman by name, and stating that she would like to say more about them both.  (ECF No. 92 at 10).

It is true that Plaintiff alleges that her change in work hours (however small), now requires her to pay more childcare expenses.  (ECF No. 88 at 11).  As the Supreme Court explained in *Burlington*, "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."  548 U.S. at 71. Indeed, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." *Burlington*, 548 U.S. at 69.  Yet, the circumstances of this case, when judged from the perspective of a reasonable person in Plaintiff's position, still lead the Court to the same conclusion.  During the first week of her new job, Plaintiff requested that her work hours be changed to accommodate her childcare needs.  (ECF No. 92 at 2).  Her request was accommodated almost immediately, as the principal changed her hours that same week.  (*Id.* at 2).  These undisputed facts, coupled with Plaintiff's continued reporting of misconduct after her transfer, indicate that her transfer was not an adverse employment action that might dissuade a reasonable worker from making a sexual harassment complaint.[14]  *Tepperwien*, 663 F.3d at 572

---

[14] The Court notes that Plaintiff claims that she was "dissuaded from complaining further" by, for example, not filing an EEOC charge or a subsequent Title IX complaint against Medina and Guzman.  (ECF No. 88 at 15).

("Indeed, while the test is an objective one, it is relevant that Tepperwien himself was not deterred from complaining—he complained numerous times"); *De Jesus-Hall*, 856 F. App'x at 331 (holding that a transfer was not an adverse employment action that would dissuade a reasonable worker from making a complaint of discrimination and noting that Plaintiff herself made a subsequent complaint months after her transfer).

Second, Defendants' alleged failure to investigate her various complaints, including her sexual harassment allegations against Medina and Guzman and the improper dissemination of her Title IX complaint, also do not constitute materially adverse employment actions. To be sure, Plaintiff's allegations of harassment against Medina and Guzman are serious ones that raise serious questions about the work environment at Dodson. But the remaining claims here are not about whether Plaintiff suffered such harassment, but whether YPS's and Quezada's alleged failure to investigate her allegations give rise to a triable claim for retaliation. The Second Circuit's analysis in *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010), is instructive here. In the context of a Section 1981 employment retaliation case,[15] the Court found that "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint." *Fincher*, 604 F.3d at 721 – 722. The Court explained that "[a] contrary rule could have odd consequences. A person not in fact discriminated against could complain of discrimination nonetheless. If the miffed accused employer were, because of his or her anger, to decline to investigate what was in fact a false claim, the employee might have a

---

Plaintiff claims that she "did not raise complaints about Medina until this instant action." (*Id.*) However, Plaintiff did complain to Voorheis after her transfer in both May and November 2019, and her November message identified Medina by name and stated that she had information to provide to Voorheis about her. (ECF No. 92 at 10).

[15] Section 1981 claims, like Title VII claims, are evaluated under the three step *McDonnell-Douglas* burden shifting framework. *Fincher*, 604 F.3d at 720.

viable suit for retaliatory failure to investigate.  We do not think that to be the law." *Id.*  The same logic applies here.  To the extent Plaintiff argues that Defendants failed to investigate her allegations in retaliation for her bringing those same allegations, the Second Circuit does not classify that as an adverse employment action.  *Fincher*, 604 F.3d at 721.

Plaintiff also appears to allege – however obliquely – that Defendants failed to investigate her complaints against Medina and Guzman (and her complaint about the improper dissemination of her Title IX complaint) in retaliation for her *earlier* complaint about Cassano.[16] But this too fails to rise to the level of an adverse employment action.[17]  Again, the key issue is whether Defendants' failure to investigate the allegations against Medina and Guzman might dissuade a reasonable worker from making or supporting a charge of sexual harassment.  *See Daniel v. ABM Indus., Inc.*, No. 16-CV-1300 (RA), 2017 WL 1216594, at *12 (S.D.N.Y. Mar. 31, 2017) (finding failure to investigate did not constitute adverse employment action because it would not dissuade a reasonable worker from making or supporting a charge of discrimination). That inquiry requires that Plaintiff suffer some demonstrable harm from Defendants' failure to investigate.  *Id.*  As Judge Abrams noted in *Daniel*, cases where failures to investigate were found to be adverse employment actions were "exceptional," and involved Plaintiffs who suffered a high level of demonstrable harm.  *See id.* (collecting cases).  For example, in *Rochon v. Gonzalez*, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006), the court found that the plaintiff – an FBI agent – suffered an adverse employment action where he alleged that the FBI failed to investigate a death threat due to his earlier complaint of discrimination.  438 F.3d at 1219-20.

---

[16] Plaintiff briefly mentions that "but-for her transfer requests and initial complaints about Cassano, she…would not have had her complaints ignored by HR."  (ECF No. 88 at 18).

[17] In *Fincher*, the Second Circuit noted that a failure to investigate might be an adverse employment action if it is in retaliation for some separate protected act by the plaintiff.  604 F.3d at 722.  But the Second Circuit left open the question of whether an employer's failure to investigate a complaint in retaliation for the filing of a prior complaint could constitute an adverse employment action.

Likewise, in *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 349 (6th Cir. 2008), the court held that an employer's failure to investigate allegations that Plaintiff's car was set on fire by a co-worker could constitute an adverse employment action.  517 F.3d at 349.

No such demonstrable harm exists here, even after all inferences are drawn in Plaintiff's favor.  It is undisputed that Plaintiff filed a formal Title IX complaint against Cassano on April 11, 2019 (ECF No. 92 at 5) and that Quezada transferred Cassano out of Dodson the next day. (*Id.* at 5, 6).  Plaintiff also voluntarily requested a transfer to Cesar Chavez on April 17, 2019, after conveying her allegations to Turner (*id.* at 3, 7 – 8, 15), and her transfer request was granted just six days later.  (*Id.* at 7 - 8).  After Plaintiff's transfer, she did not face any further contact with Medina (*id.* at 8), and she tried to report her allegations against Medina and Guzman because she said that she now felt safe doing so.  (*Id.* at 3, 8 - 9). Although Voorheis delayed notifying Plaintiff about the completion of his investigation into Cassano, there is no dispute that he did conduct the investigation and ultimately found Plaintiff's allegations founded.  (*Id.* at 10). And by the time Voorheis reported the results of his investigation to Plaintiff in November 2019, Medina had resigned from her position as Principal in August 2019.  (ECF No. 92 at 4, 10).

At worst, Defendants failed to fully investigate Plaintiff's complaints against Medina and Guzman after she conveyed them to YPS officials.  But Plaintiff can point to no demonstrable harm that worsened the conditions of her employment or otherwise adversely affected her because of those failures.  Considering the facts of Plaintiff's case in context, no reasonable juror could find that a reasonable worker might be dissuaded from making a future complaint as a result of Defendants' failures to investigate.  Indeed, Plaintiff herself did report sexual harassment discrimination to YPS officials in the months that followed her transfer, including messages sent to Voorheis on May 21, 2019, and November 19, 2019.  (ECF No. 92 at 10, 21).

Third, Defendants' alleged failure to promptly inform her of the outcome of her Title IX complaint is not a materially adverse employment action.  Plaintiff alleges that she suffered a materially adverse employment action when Voorheis failed to promptly inform her of the outcome of her Title IX complaint against Cassano.  (ECF No. 88 at 16 – 17).  But even if this delay were intentional, there is no way to view this action as likely to dissuade a reasonable worker from making a future complaint.  As noted above, Plaintiff's Title IX complaint was investigated, and her allegations were considered founded.  (ECF No. 92 at 10).  After she filed her Title IX complaint, Turner met with Quezada, who then granted Plaintiff's transfer request.  (*Id.* at 7 – 8).  Also, in response to Plaintiff's Title IX complaint, the person Plaintiff complained about was transferred to another school.  (*Id.* at 5, 6).  It is hard to see how getting delayed notice about the positive outcome of Plaintiff's Title IX complaint could be viewed as a materially adverse employment action.

The logic applied by the Second Circuit in *Fincher* applies with equal force here.  In that case, the Second Circuit found that an employer's failure to investigate a complaint could not be considered an adverse employment action taken in retaliation for the filing of that same complaint.  *Fincher*, 604 F.3d at 721.  By that same logic, Defendants' failure to inform Plaintiff promptly about the outcome of their investigation into her complaint cannot be considered an adverse employment action taken in retaliation for the filing of that same complaint.  Otherwise, a plaintiff could make an unmeritorious complaint, and if they are not promptly informed of the investigative results, then bring a meritorious retaliation action.  *Fincher*, 604 F.3d at 721 ("If the miffed accused employer were, because of his or her anger, to decline to investigate what was in fact a false claim, the employee might have a viable suit for retaliatory failure to investigate. We

do not think that to be the law").  Indeed, Plaintiff cites no case law in which a court deemed a failure to inform a complainant of the results of her complaint an adverse employment action.

2. <u>Plaintiff cannot establish a causal relationship between her protected activity and the alleged adverse employment action of her transfer to Cesar Chavez.</u>

Plaintiff's retaliation claim based on her transfer to Cesar Chavez also fails because she cannot establish that retaliation was the but-for cause of her transfer.[18]  As noted above, but-for causation "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Zann Kwan*, 737 F.3d at 845 (*quoting Nassar*, 570 U.S. at 360).  Here, the undisputed evidence shows that Plaintiff was transferred because she asked to be transferred, not because of retaliation for making complaints.  Indeed, Plaintiff admits that "she was transferred, *at her request*, to Cesar Chavez," and that she "was *voluntarily* transferred."  (ECF No. 92 at 3, 8) (emphasis added).  Thus, even if Plaintiff can establish that her transfer to Cesar Chavez was a materially adverse employment action, the undisputed evidence shows that she was not transferred in retaliation for engaging in a protected activity.[19]

**B.  *Monell* Claim[20]**

A plaintiff can prove *Monell* liability by establishing that (1) a municipal policy or custom (2) caused them to endure (3) the deprivation of a constitutional right.  *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020).  Here, Plaintiff claims that Defendants

---

[18] The parties briefly quibble over the extent to which temporal proximity can be considered to support Plaintiff's claim that her transfer to Cesar Chavez was retaliatory.  (ECF Nos. 88 at 18; 91 at 11).  However, for the reasons stated *supra*, it is undisputed that Plaintiff was transferred because she asked to be transferred, thus evaluating temporal proximity to establish causation is unnecessary.

[19] The Court declines to address but-for causation with respect to Plaintiff's other arguments (i.e. that Defendants failed to properly investigate her complaints), which fail for the reasons discussed above.

[20] Plaintiff's complaint pleads the *Monell* claim against the "Municipal Defendants."  (ECF No. 1 at 15).  As an initial matter, the Court questions whether the language "Municipal Defendants" includes Quezada, because he is not a municipality. But viewing all allegations in the complaint in the light most favorable to Plaintiff, the Court overlooks this inartful pleading to address the merits of Plaintiff's claim, which fails for other reasons.

are subject to *Monell* liability because "Quezada was vested with state power to enforce all YPS policies" and failed to follow up on her complaints of Medina's sexual harassment. (ECF No. 88 at 21). Plaintiff also claims that Quezada "exhibited a deliberate indifference when he failed to inquire with Plaintiff further about what was making her feel unsafe." (*Id.*) Defendants move for summary judgment, arguing that Plaintiff cannot establish that any alleged retaliatory conduct stemmed from a municipal policy or custom. (ECF No. 83 at 18 – 20). As explained below, the Court grants Defendants' motion and dismisses Plaintiff's *Monell* claim as a matter of law.

1. Plaintiff cannot demonstrate the deprivation of a constitutional right on which *Monell* liability may be based.

To establish *Monell* liability, there must be a deprivation of a constitutional right on which such liability is based. *Agosto*, 982 F.3d at 97. Here, the Court has now dismissed Plaintiff's one remaining Section 1983 retaliation claim against both YPS and Quezada. And the allegations that give rise to Plaintiff's *Monell* claim are the same as those underlying her now dismissed claim—that YPS and Quezada failed to follow up on her complaints of Medina's sexual harassment. Without liability on Plaintiff's underlying retaliation claim, Plaintiff has not demonstrated the deprivation of any constitutional right by either YPS or Quezada.

In addition, if liability is not found for an individual employee's actions (in this case, Quezada), then YPS (as the municipality) cannot be found liable for a related *Monell* claim. *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (per curiam). In other words, if a Plaintiff cannot establish her underlying retaliation claim against an individual defendant, then the related *Monell* claims cannot proceed as a matter of law. *See Lax v. City Univ. of New York*, No. 20-3906-CV, 2022 WL 103315, at *3 (2d Cir. Jan. 11, 2022) (summary order) ("Because he has failed to establish individual liability on his discrimination, retaliation, and hostile work environment

claims, Lax's claims against CUNY under Monell fail as a matter of law") (*citing Heller*, 457 U.S. at 799); *Wright v. City of Syracuse*, 611 F. App'x 8, 12 (2d Cir. 2015) (summary order).

It is true that "under *Monell*, municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants." *Barrett v. Orange Cty. Hum. Rts. Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999). But here, the only actions on which Plaintiff bases her *Monell* claim are those of Quezada, who she alleges failed to follow up on her complaints of Medina's sexual harassment (ECF No. 88 at 21), and "exhibited a deliberate indifference when he failed to inquire with Plaintiff further about what was making her feel unsafe." (*Id*.) Thus, Plaintiff has presented no facts that she suffered a constitutional injury caused by anyone who was not named as an individual defendant. As such, Plaintiff fails to make out a claim for *Monell* liability against YPS and Quezada as a matter of law.

Plaintiff still argues that she "was subjected to deprivation of her Constitutional rights by Quezada because he 'exhibited deliberate indifference…by failing to act on information indicating that unconstitutional acts were occurring.'" (ECF No. 88 at 22, *quoting Littlejohn v. City of N.Y.*, 795 F.3d 297, 314 (2d. Cir. 2015)). Thus, Plaintiff appears to suggest that Quezada's "deliberate indifference" somehow constitutes a separate deprivation of her constitutional rights, independent of her Section 1983 retaliation claim. But this argument fails. Judge Briccetti already dismissed claims against Quezada based on Plaintiff's argument that "Quezada exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring." (ECF No. 82-19 at 26 – 27).[21] In that same ruling, the Court noted that Plaintiff "cites no case law in support of her contention that Quezada had a duty

---

[21] Referring to the .pdf page number.

to investigate her complaint further or that his failure to do so was somehow discriminatory."

(*Id.*)  Because the Court has already found that Quezada cannot be liable for exhibiting deliberate

indifference to Plaintiff for failing to investigate or following up on her complaints (albeit in the

context of her discrimination and hostile work environment claims), it necessarily follows that

Quezada cannot be liable for *Monell* liability based on those same allegations.

> 2. Plaintiff cannot identify any municipality or custom that gave rise to the alleged
> retaliatory conduct.

Even assuming Plaintiff could make out a claim for some deprivation of a constitutional

right, separate from those already dismissed, Plaintiff's claim still identifies no municipal policy

or custom that gave rise to the alleged retaliatory conduct.  To establish a municipal policy or

custom, "[a] school district's liability under *Monell* may be premised on any of three theories: (1)

that a district employee was acting pursuant to an expressly adopted official policy; (2) that a

district employee was acting pursuant to a longstanding practice or custom; or (3) that a district

employee was acting as a 'final policymaker.'"  *Hurdle v. Bd. of Educ. of City of New York*, 113

F. App'x 423, 424–25 (2d Cir. 2004) (summary order).  Here, the parties offer no evidence that

Quezada's alleged liability for failing to investigate Plaintiff's sexual harassment allegations

stems from an expressly adopted policy or a longstanding practice or custom.  In fact, it appears

that YPS has an express policy against sexual harassment in the workplace, along with grievance

procedures for resolution of complaints.  (ECF No. 82-16).  Thus, whether Quezada acted

pursuant to a municipal policy or custom turns on whether Quezada acted as a final

policymaker.[22]

---

[22] "As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury."  *Hurdle*, 113 F. App'x at 425 (*quoting Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

To begin, it is doubtful that a single decision not to investigate an individual employee's allegations of sexual harassment can constitute a municipal policy or custom. This seems particularly true here, where there is evidence of a municipal policy that says the "district will promptly investigate all complaints of sexual harassment, either formal or informal, verbal or written." (ECF No. 82-16 at 4).[23]  In other words, in this case, a single decision not to investigate an individual employee's allegations appears to be *against* municipal policy, not in furtherance of it.  Indeed, in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), the Supreme Court noted that "'official policy' often refers to formal rules or understandings – often but not always committed to writing – that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." 475 U.S. at 480.  Yet it is also true that a single action taken by a municipality may be sufficient to expose it to liability. *Id*. at 481 ("where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly."); *see also Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) ("It is not necessary, therefore, for plaintiffs to prove that a municipality has followed a particular course of action repeatedly in order to establish the existence of a municipal policy; rather, a single action taken by a municipality is sufficient to expose it to liability.")

Ultimately, "municipal liability under Section 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483.  Thus, even assuming the decision not to investigate one employee's sexual harassment allegations constitutes a municipal policy, the Court would still

---

[23] Referring to the .pdf page number.

need to find that Quezada is a "final policymaker" about whether and when to conduct such investigations. *Compare Hurdle*, 113 F. App'x 423, 427 (2d Cir. 2004) (summary order) ("Even if [Superintendent] Romandetto was the *decisionmaker* with regard to Hurdle's transfer, that does not establish that she had the authority to set the policy authorizing involuntary employee transfers").

Whether a government official "has final policymaking authority is a question of state law." *Hurdle*, 113 F. App'x at 425 (*citing City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)). Neither party identifies any relevant authority under New York law that describes who has explicit authority to set policy for sexual harassment investigations.[24] More generally, Section 2566 of the New York Education Law governs the duties of Superintendents, and states that the Superintendent shall possess certain powers and duties "subject to the by-laws of the board of education." N.Y. Ed. Law § 2566. Although New York Education law gives the Superintendent the power "[t]o enforce all provisions of law and all rules and regulations," N.Y. Ed. Law § 2566(2), those powers remain "under the direction of the board of education*." Id*. Section 2566(6) further states that the Superintendent shall "report to said board of education violations of regulations and cases of insubordination, and to suspend an associate, assistant, district or other superintendent, director, supervisor, expert, principal, teacher or other employee until the next regular meeting of the board, when all facts relating to the case shall be submitted to the board for its consideration and action." N.Y. Ed. Law § 2566(6). At most, this statute says that the Superintendent has a duty to enforce regulations and report violations. But it says

---

[24] Plaintiff cites to case law, such as *Agosto v. New York City Department of Education*, 982 F.3d 86 (2d. Cir. 2020), that discusses the power of the New York City Chancellor of Schools. (ECF No. 88 at 19 – 21). But the New York State Education Law distinguishes the New York City Chancellor of Schools as a different position from other school superintendents and promulgates different powers and authority for the positions via separate statutes. *Compare* N.Y. Ed. Law §2566 and § 2590-h.

nothing about whether the Superintendent has final policymaking authority about such violations, or about sexual harassment investigations in particular.

If anything, Section 2566 suggests that it is the Board of Education that sets final policy, not the Superintendent.[25]  As noted above, the Superintendent's power to enforce "rules and regulations" is done "under the direction of the board of education" to whom the Superintendent must "report" violations and "submit" all facts "for its consideration and action."  N.Y. Ed. Law §§ 2566(2), (6).  Because the Superintendent is statutorily required to report rule violations to the Board and submit facts to them for their "consideration and action," this indicates that the Superintendent cannot have "final" policymaking authority about investigating rule violations. Thus, although a Superintendent may be a decision-maker, with the power to enforce and implement policies, the Board of Education is the final policymaker.  *See, e.g., Jones v. Bay Shore Union Free Sch. Dist.*, 170 F. Supp. 3d 420, 438 (E.D.N.Y.), aff'd on other grounds, 666 F. App'x 92 (2d Cir. 2016) (holding that under N.Y. Ed. Law § 1711 – a statute similar to § 2566 but applicable to Union Free School Districts – a Superintendent in a free speech employment discrimination case may be a decisionmaker, but the Board of Education is the final policymaker).

Indeed, even if Quezada made a final decision not to investigate Plaintiff's allegations, that still does not mean that Quezada was a final policymaker. *Hurdle*, 113 F. App'x at 427.[26]

---

[25] The YPS policies identified by the Defendant similarly state that "[p]olicy adoption is the function of the Board" (ECF No. 82-17, Policy 2410, citing "Formulation, Adoption, Amendment and Suspension of Policies"), and that the "Board of Education is the legally constituted body, politic and corporate, charged with the responsibility of establishing policy for the maintenance and operation of the City School District of the City of Yonkers." (ECF No. 82-17, policy 2110, citing School Board Powers and Duties).

[26] Plaintiff incorrectly states that the Second Circuit "equat[es] a final decisionmaker with a final policymaker." (ECF No. 19, *citing Friend v. Gasparino*, 61 F. 4th 77, 99 (2d Cir. 2023)).  In fact, *Friend* states the exact opposite: "*Were we* to 'equat[e] a final decisionmaker with a final policymaker,' we 'would effectively impose respondeat superior liability—making the municipality liable for the conduct of its employees—in violation of *Monell.*'" *Friend*, 61 F.4th at 95 (*quoting Agosto*, 982 F.3d at 91) (emphasis added). The Second Circuit declined to do so.

The Second Circuit's decision in *Hurdle* is particularly instructive.  In that case, the Court held that even if a Superintendent were a decisionmaker about an employee's involuntary transfer, that does not establish that the Superintendent "had the authority to set the policy authorizing involuntary employee transfers." *Hurdle*, 113 F. App'x at 427.  Likewise, even if Quezada were the final decisionmaker about whether to investigate Plaintiff's allegations of sexual harassment, that does not establish that he had the authority to set policy for investigating sexual harassment. Indeed, as discussed above, Section 2566 suggests that it is the Board of Education that sets final policy, not the Superintendent.

**CONCLUSION**

For the reasons stated above, Defendants' joint motion for summary judgment is GRANTED and the Clerk of Court is directed to close out ECF Nos. 81.

**SO ORDERED.**

DATED:    White Plains, New York
March 29, 2024

_____
VICTORIA REZNIK
United States Magistrate Judge